# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs December 9, 2014 at Knoxville

## STATE OF TENNESSEE v. JAMES RUSSELL JONES, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2011-D-3684      Monte D. Watkins, Judge**

---

**No. M2013-02270-CCA-R3-CD - Filed April 2, 2015**

---

The defendant, James Russell Jones, Jr., was convicted by a Davidson County Criminal Court jury of two counts of aggravated rape, a Class A felony; attempted aggravated rape, a Class B felony; aggravated sexual battery, a Class B felony; and simple assault, a Class A misdemeanor. He was sentenced by the trial court as a Range II, multiple offender to thirty years at 100% for each of the aggravated rape convictions, as a Range III, persistent offender to twenty-five years at 45% for the attempted aggravated rape conviction and twenty-five years at 100% for the aggravated sexual battery conviction, and to eleven months, twenty-nine days for the misdemeanor assault conviction. The trial court ordered the sentences for the four felony convictions served consecutively, for an effective sentence of 110 years in the Tennessee Department of Correction, to be served consecutively to the defendant's life sentence for a South Carolina conviction. On appeal, the defendant challenges the sufficiency of the evidence in support of his convictions and argues that the trial court erred by denying his request for a mistrial, by ordering consecutive sentences, and by allowing the jury to deliberate on Counts 1 and 2 of the indictment when venue in Davidson County had not been established. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and TIMOTHY L. EASTER, J., joined.

Michael A. Colavecchio, Nashville, Tennessee, for the Defendant-Appellant, James Russell Jones, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Hugh T. Ammerman and Robert McGuire, Assistant District Attorneys General, for the Appellee, State of Tennessee.

# OPINION

## FACTS

According to the State's proof at trial, on August 14, 2011, the defendant was driving the victim home from a bar when the two got into a verbal argument that progressed to the defendant's hitting and choking the victim, fondling her breasts and genitals, and digitally penetrating her vagina. The victim called 911 as she and the defendant were traveling in his car, but the defendant took her cell phone from her and hung up on the 911 operator. The defendant continued fondling the victim as he drove her to his condominium in Hermitage, where, over the course of the next two days, he forced her into various sex acts with him. On August 16, 2011, the victim managed to flee from the defendant and seek the assistance of two individuals she encountered at the defendant's condominium complex. The defendant was subsequently indicted by the Davidson County Grand Jury with three counts of aggravated rape, one count of aggravated sexual battery, two counts of rape, and one count of aggravated kidnapping. The State dismissed the kidnapping charge, however, before the jury was empaneled in the defendant's April 13-16, 2013 trial.

## Trial

## State's Proof

James Hunter Johnston, a Wilson County 911 dispatcher, identified a recording of a 911 call he received at 10:37 p.m. on August 14, 2011, from the victim's cell phone, which, he said, contained the sounds of a female in apparent distress, followed by the line going dead. He said that he sometimes receives 911 cell phone calls associated with incidents occurring in adjacent Davidson County.

The forty-year-old victim testified that she worked at one time as a charge nurse in a hospital but had become addicted to prescription medication following her mother's death in 2005, which led to convictions for obtaining a controlled substance by fraud, DUI, and public intoxication. She said she was currently incarcerated for the prescription drug convictions, having violated her probation with her public intoxication conviction. During the first part of August 2011, she stayed with a friend, Steven Mengas, who had taken her in when she was homeless. However, for some reason she could not recall, Mengas became upset with her on Sunday, August 14, 2011. She, therefore, asked him to take her to the home of the defendant, whom she had met a couple of months earlier at a bar in Hermitage and who had offered to let her stay with him until she checked into her scheduled drug rehabilitation program. The defendant lived with his sister and his brother in a condominium in Hermitage, and she had visited with him and his family there on one prior occasion.

-2-

The victim testified that after she arrived at the defendant's home sometime in the afternoon of August 14, she and the defendant went together to a bar where they drank some beers and ate dinner. When they left, she asked the defendant to take her back to Mengas' home in Lebanon. She and the defendant had both been drinking, and they got into an argument while traveling in his vehicle on Lebanon Road. She called him a "b****," and he began yelling at her and hitting her in the left leg and left side of her face with his fist. She called 911, but the defendant took her cell phone from her. The defendant got off Lebanon Road and was driving through the neighborhood stopping and starting his car during this time. He then got back on Lebanon Road and began heading west toward Nashville. At some point, he drove behind a strip mall, stopped the car, choked her with both hands around her neck, and ordered her to raise her shirt and lower her pants. When she complied, he began pinching her nipples and touching her "female area."

The victim testified that the defendant continued touching and fondling her during the entire time that he drove her in his vehicle back to his home. During that drive, the defendant "put his hand inside of [her]." When they reached his condominium, she put her clothes back on, and the two of them went inside. Once inside, the defendant retrieved from a bag beside the living room couch a belt and a pump that he used on his penis to achieve an erection. By placing the belt around her head and threatening to choke her, he forced her that night into both performing oral sex on him and into engaging in penile-vaginal intercourse. She did not want to have intercourse with the defendant, and she made it clear to him when they reached his house that she was not interested in him in that way.

The victim recalled that the defendant placed a chair in the hallway to separate the living room from the kitchen area, telling her that when the chair was in that position, "everybody knew not to come in there." She also recalled that the defendant, at some point during the sexual assault that took place that night in the living room, ordered her to lie on her stomach and hit her in the back to force her to comply. She identified photographs of his home as well as photographs of the pump device he used to achieve his erections.

The victim testified that she slept with the defendant in his bed in the loft area of the condominium on the night of August 14. When she awoke on August 15, she felt nauseous and repeatedly threw up. She slept for most of that day and could recall only "[b]its and pieces" of what occurred. She remembered that she took some drugs, including Lortab, Xanax, and, perhaps, Oxycontin, during the time that she spent at the defendant's home, but she could not recall exactly when she took them. She also remembered that the defendant at some point that day took her to Walmart, where he bought her some clothes. They then went to a grocery store, where she remained in the defendant's car while he went inside to buy groceries. The victim testified that she did not try to escape when the defendant left her alone in the car because she was confused and uncertain what to do. She explained that she

was scheduled to enter rehab shortly as a condition of retaining her nursing license, had just gotten a DUI, was homeless, and was concerned about her probation status. Thus, she did not want to have any encounters with the police at that point.

The victim recalled that she took a nap when she and the defendant returned to his home. When she awoke, the defendant's sister gave her a Phenergan to keep her from vomiting. That night, the defendant again forced her to perform oral sex on him by threatening once again to choke her with the belt. The victim remembered that the sexual encounter that night occurred in the living room on top of an inflatable mattress on which the defendant had placed a quilt with "little bonnets on it." She said she slept that night on the couch while the defendant slept on the mattress and quilt. At some point, the defendant's brother "poked his head around the corner into the living room," but that was the extent of her encounter with him.

The victim testified that when she awoke on the morning of Tuesday, August 16, she was, unlike the previous days, sober and that her first thoughts were that she wanted away from the defendant and his home. She said she had told the defendant the previous night that she was menstruating because she was trying to get him to stop touching her. The defendant gave her a washcloth that night to put in her clothes, and on Tuesday morning when she was changing her clothes he came upstairs to check her underwear. When he did not see any blood, he became very angry, told her to get onto her hands and knees, and then put his hand inside her to check for blood but did not find any.

The victim testified that the defendant wanted to go swimming that morning and took her with him to the complex's swimming pool. As he was swimming laps in the pool, she first made an unsuccessful attempt to get the attention of a woman who was sunbathing at the pool and then fled from the pool area to a man and a woman nearby. The victim said she informed the woman that she had been raped and raised her shirt to show her the injuries on her back. She stated that the woman called 911 and took her to a service station to wait for the police, who, in turn, took her to the hospital.

On cross-examination, the victim acknowledged that she had been released from jail only one week before the events transpired and that she and the defendant had been thrown out of a bar together on or about August 10. She said that she and the defendant were on Lebanon Road driving toward Lebanon when she made her 911 call but that they never made it as far as Highway 109. She stated that the defendant did not choke her until he stopped at the strip mall located close to the intersection of Mount Juliet and Lebanon Roads. Finally, she acknowledged that she did not try to get the attention of any passing motorists as she and the defendant were driving to his home and did not try to seek the assistance of any shoppers in the grocery store parking lot when she was alone in the defendant's vehicle.

-4-

Mark J. Bolling, the former maintenance technician for the defendant's condominium complex, testified that he was replacing some rotten wood at one of the condominium units on the morning of August 16, 2011, when the hysterical victim came running from the pool area and tearfully told him that she had been kept against her will for the past couple of days and "burned with cigarettes and different things" by a man who had taken her out to dinner. The victim, who appeared very frightened, repeated her story to Bambi Broersma, who was the caretaker for the resident of the unit on which Bolling was working, and she showed him and Bambi the cigarette burns on her forearms. On cross-examination, Bolling testified that the victim never told him that she had been sexually assaulted.

Bambi Broersma, the caregiver for a disabled woman who lived in one of the condominium units, testified that on the morning of August 16, 2011, she was on the back patio of the unit talking to the maintenance man about some repairs when the shaking victim, who appeared to be terrified, showed up and said, "[H]elp me, this man's been holding me hostage for two days, raping and beating me[.]" Broersma recalled that the victim lifted her shirt, revealing bruises "all along her stomach[.]" She did not remember seeing any burns on the victim. She said she instructed the victim to get into her car and lay the seat down so that she would not be visible to the perpetrator. She then drove the victim around the block and telephoned the police. Broersma testified she had never seen anyone who appeared as terrified as the victim and that the victim's terror made her afraid for herself as well.

Detective Charles Fleming of the Metro Nashville Police Department's Sex Crimes Unit identified photographs of the victim's injuries taken at the hospital on August 16, 2011, including "red and bruising marks" on her neck, left thigh, left buttocks, waist, and right arm. He also identified an audio recording of a controlled phone call that the victim, at his request, had made to the defendant. He testified that the defendant, in the phone call, denied any sexual contact with the victim but that his DNA matched the DNA of sperm recovered from the victim's vagina. He further testified that among the items he found in the defendant's home was a quilt with bonnets, located in a closet, and a penis pump, which was in the defendant's bedroom.

Katherine Elizabeth Parnell, the forensic nurse who performed the rape kit on the victim on August 16, 2011, testified that she observed the following injuries on the victim: two bruises on her right arm; bruising on her left breast; bruising on her left thigh; bruising on her left buttock; bruising on the back of her right thigh; tenderness on the back of her neck; and swelling and tenderness to her left temple. She said the victim, who was tearful throughout the examination and interview, told her that the defendant had taken her out to eat on August 14, 2011, and struck her on the left temple in his vehicle after she asked him to take her home. The victim reported that she called 911, but the defendant took her phone from her and forced her to ride around with her shirt up and pants down while he was

"fingering her[.]" The victim also reported that the defendant had raped her that night and threatened to choke her with his belt and his hands.

Dr. Laura Boos of the Tennessee Bureau of Investigation, an expert in DNA analysis, testified that the DNA profile she obtained from the sperm fraction found on the victim's vaginal swabs matched the defendant's DNA profile, with the probability of an unrelated individual having the same profile exceeding the current world population.

## Defendant's Proof

The defendant's brother, Timothy Jones, testified that he spoke with the victim and the defendant for thirty or forty minutes late Sunday evening, August 14, as the three of them sat together at the dining room table drinking beer, talked to the victim again at about 2:00 a.m. Monday morning when he encountered her alone in the kitchen as she was getting a snack, and saw the victim and the defendant again briefly at about midnight on Monday/Tuesday morning when they walked through the house to go outside to smoke. The victim never appeared upset and at no time attempt to signal him that anything was wrong. On cross-examination, the witness testified that he could not recall having told Sergeant David Slessinger on Tuesday, August 16, that everyone was "scared to death of [the defendant] and that's why they allow him to do as he pleases."

The defendant's sister, Shirley Jones, testified that she stayed with a friend on Sunday, August 14, arriving home to her condominium at 5:20 p.m. Monday to find her brother, Timothy, in the kitchen, the victim upstairs, and the defendant gone to the grocery store. She said the victim came downstairs complaining that she was sick to her stomach and had been vomiting, so she gave her a Phenergan to settle her stomach. About fifteen minutes later, the defendant returned from the store with some cokes for the victim. The victim then went back upstairs to lie down, Timothy left the home, and the defendant began preparing a salad for dinner. Approximately thirty minutes later, the victim came back downstairs and ate dinner with the defendant while the witness sat and visited with the defendant and the victim. For the remainder of the evening, the victim and the defendant stayed home, occasionally going out to the courtyard to smoke. Before the witness went to bed at 11:30 p.m., the defendant asked her to help him set up her inflatable mattress in the living room because the victim was sick and was going to sleep alone upstairs. The victim did not appear upset that night and never attempted to signal the witness that anything was amiss. The witness left for work the next morning without seeing the victim again.

On cross-examination, the witness denied having told the police in a statement on Tuesday, August 16, 2011, that the defendant did not call the victim to come over until after she had said he could have the house to himself. After the prosecutor played a portion of a

recording, the witness insisted that she had not given a statement to police that night and did not think the voice on the recording was hers. After a further portion of the recording was played, the witness acknowledged that the voice on that portion was hers. She insisted, however, that she did not remember having made the first statement and still did not think the voice on that recording sounded like hers.

The defendant elected not to testify and rested his case without presenting any further proof.

## State's Rebuttal Proof

Sergeant David Slessinger of the Metro Nashville Police Department's Sex Crimes Unit testified that while the police were executing their search warrant at the defendant's residence on August 16, 2011, the defendant's brother, Timothy Jones, made the statement that "[e]veryone is scared to death of [the defendant] . . . [a]nd that's why they allow him to do as he pleases." He said that Timothy Jones did not want him to tell his sister what he had just revealed about the defendant. On cross-examination, Sergeant Slessinger testified that he understood Timothy Jones to be referring to both the present and the past with his statement about everyone being afraid of the defendant.

## Defendant's Surrebuttal Proof

Timothy Jones testified that when he made the statement about everyone being afraid of the defendant, he was referring to the past.

The State made the following election of offenses: Count 1, aggravated rape: the digital penetration that occurred during the car ride after the victim was beaten and choked by the defendant behind the strip mall; Count 2, aggravated sexual battery: the fondling and touching of the victim's breasts and genital area that occurred during the car ride after the victim was beaten and choked; Count 3, aggravated rape: the victim's being forced to perform oral sex on the defendant at his Hermitage home after the defendant placed a belt around her neck and threatened her with strangulation; Count 4, aggravated rape: the victim's being forced into penile-vaginal intercourse with the defendant at his Hermitage home after the defendant placed a belt around her neck and threatened her with strangulation; Count 5, rape: the victim's being forced to perform oral sex on the defendant in the defendant's home on the evening of the day in which she had been nauseous all day; and Count 6, rape: the defendant's having touched the victim's genital area on the morning of August 16 after having confronted her about whether she was menstruating. Following deliberations, the jury found the defendant guilty of attempted aggravated rape in Count 1, guilty of aggravated sexual battery in Count 2, guilty of aggravated rape in Counts 3 and 4,

not guilty in Count 5, and guilty of assault in Count 6.

## Sentencing Hearing

At the sentencing hearing, the State introduced the presentence report, which reflected that the sixty-five-year-old defendant had a lengthy and substantial criminal history. The State also introduced certified copies of the defendant's state and federal felony convictions on which it was relying to establish his sentencing ranges, which included 1992 South Carolina convictions for armed robbery, kidnapping, and safecracking. The State also noted that the defendant, at the time of the offenses, was both on parole from a life sentence in South Carolina and on supervised release from a federal sentence.

The defendant testified that his 1992 South Carolina convictions for safecracking, kidnapping, burglary, and armed robbery all stemmed from a single incident. Similarly, his 1991 convictions in federal court for aiding and abetting credit card fraud and transportation of stolen property were based on one incident. As for his convictions in the instant case, the defendant claimed that they were based on "a total fabrication," and went on to provide his version of the events, which essentially mirrored the version he provided for his presentence report. The defendant began his version in the presentence report with the following statement:

> I am not guilty of this charge. She was my whore, you cannot rape your whore. You cannot be charged with kidnapping when you own her. The whole idea is ridiculous. My brother and sister interacted with her socially, as a guest in our home.

The defendant claimed that the victim's bruises occurred from her boyfriend's having kicked her out of his moving vehicle. He said that the victim was free to leave at any time, always had her cell phone with her, called her probation officer while she was at his home to report her location, and met the defendant's parole officer when he came to his home during the time the victim was the defendant's guest. He also claimed that the victim had ridden with an "outlaw" motorcycle gang, was a "trickster," and "may have pulled this before."

Applying three enhancement factors – the defendant's previous history of criminal conduct or criminal convictions in addition to those necessary to establish his range, the fact that the defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community, and the fact that the defendant was on parole at the time the felonies were committed, see Tenn. Code Ann. § 40-35-114(1), (8), (13) (2010 & 2014) – the trial court sentenced the defendant as a Range III offender to twenty-five years

at 45% for the attempted aggravated rape conviction and to twenty-five years at 100% for the aggravated sexual battery conviction, as a Range II offender to thirty years at 100% for each of the aggravated rape convictions, and to eleven months, twenty-nine days for the misdemeanor assault conviction. Finding the defendant to be a professional criminal who had knowingly devoted his life to criminal acts as a major source of his livelihood and an offender whose record of criminal activity was extensive, the court ordered that the sentences for the four felony convictions run consecutively to each other and consecutively to the defendant's life sentence in South Carolina, for an effective sentence of 110 years in the Department of Correction.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first two issues, the defendant argues that the evidence was insufficient for a rational jury to find the essential elements of the crimes beyond a reasonable doubt and that the trial court should have exercised its role as thirteenth juror to overturn the convictions. When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In challenging the sufficiency of the convictions, the defendant, essentially, argues that the victim's account is not credible. In support, he points to her background of drug abuse, drinking, and criminal convictions, including obtaining prescription medication by fraud and violation of probation. He contends that the victim's "claims are also suspect" because of the many opportunities she had to leave or "escape" during her alleged ordeal, and asserts that her testimony "is likely a complete fabrication due to [the defendant's] decision to not allow [her] to stay another night in his condo[.]"

It is well-established, however, that credibility determinations, as well as the weight and value of the evidence and the resolution of conflicts in the testimony, are within the province of the jury as the trier of fact. See State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002) (citing State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999)). The victim's testimony was that the defendant beat and choked her, pinched her breasts, fondled her genital area, and digitally penetrated her vagina during the drive to his home on August 14, forced her with threats of strangulation into engaging in oral and penile-vaginal sex that night at his condominium, forced her into engaging in oral sex with him again on August 15, and digitally penetrated her vagina on August 16 when checking to see if she was lying about being on her menstrual period. As an explanation of why she did not flee when she had the opportunity on August 15 when left alone in the parking lot, she explained that she was homeless, worried about her probation status, and uncertain what to do. She also later explained that she was not sober that day.

The victim's account of having been beaten and choked by the defendant and that she was in great fear of him was corroborated in part by the testimony of other witnesses, including the man and woman whose help she sought on August 16, who witnessed her visible agitation and fear and the injuries she displayed on her arms and stomach. It was also corroborated in part by the testimony of the forensic nurse, who documented the various bruises and tenderness on the victim's body, including to her temple and neck. By acquitting the defendant of one of the counts of the indictment and finding him guilty of lesser offenses in two other counts, the jury obviously accepted some, but not all, of the victim's version of the events, as was its prerogative. We, therefore, conclude that the evidence is sufficient to sustain the convictions.

The defendant also contends that the trial court erred by not exercising its role as thirteenth juror to overturn the jury's verdicts. In support, he cites the same evidence he cited in support of his challenge to the sufficiency of the evidence, arguing that "no rational trier of fact could have found the essential elements of sexual assault, rape, or kidnapping, and therefore the judge, as thirteenth juror, should have overturned the [defendant's] conviction for those charges." Rule 33(d) of the Tennessee Rules of Criminal Procedure provides that a "trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." The rule imposes a mandatory duty on the trial judge to act as the thirteenth juror in every criminal case. See State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). The rule requires that the trial judge be personally satisfied with the verdict, see State v. Dankworth, 919 S.W.2d 52, 56 (Tenn. Crim. App. 1995), and its purpose is "to be a 'safeguard . . . against a miscarriage of justice by the jury.'" State v. Price, 46 S.W.3d 785, 823 (Tenn. Crim. App. 2000) (quoting State v. Moats, 906 S.W.2d 431, 434 (Tenn. 1995)). The trial court does not have to make an explicit statement on the record. Moats, 906 S.W.2d at 434. Instead this court may presume by the trial court's overruling of the motion for new trial that it approved of the jury's verdict. Id.

In its order denying the motion for new trial, the trial court explicitly found that the defendant had presented no claims to substantiate either a judgment of acquittal or a new trial and expressed its opinion that the verdict of the jury was valid. We conclude, therefore, that the trial court properly exercised its role as thirteenth juror and that the defendant is not entitled to relief on the basis of this issue.

## II. Denial of Motion for Mistrial

As his next issue, the defendant contends that the trial court erred by denying his motion for mistrial following the mention before the jury of the defendant's parole officer. The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id.; State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. Id.

When asked during her direct examination testimony what happened "the next day" on Monday, August 15, the victim replied that the defendant's "parole officer showed up at his door." Defense counsel immediately objected and requested to approach the bench. The trial court made the observation that it did not think the State was attempting to elicit that answer and, in a jury-out hearing that followed, instructed the victim not to mention anything about the defendant's parole officer or criminal history. Defense counsel then moved for a mistrial, arguing that a curative instruction would not be sufficient to overcome the prejudice to the defendant's case. The trial court disagreed, denying the motion and instructing the jury to disregard the mention of the parole officer and that it was not to consider it for anything with respect to the trial.

We find no abuse of discretion in the trial court's denial of the motion for mistrial. Accordingly, we conclude that the defendant is not entitled to relief on the basis of this issue.

### III. Venue

The defendant contends that the trial court erred by allowing the jury to deliberate on Counts 1 and 2 of the indictment because these alleged events occurred in Wilson, rather than Davidson, County. In support, the defendant cites the victim's testimony that she had a "beer buzz" to argue that her "testimony is suspect when it comes to the locus of the alleged assault." The defendant asserts that the assault, which definitely started in Wilson County according to the victim's testimony, "probably ended while [the victim] was in Wilson County due to her state of inebriation." The State responds by arguing that the proof established that the defendant committed the acts up until the time the defendant and the victim reached the defendant's Davidson County residence, establishing venue in Davidson County. We agree with the State.

The Tennessee Constitution provides criminal defendants with the right to a jury trial in the county where the offense was committed. Tenn. Const. art. I, § 9; State v. Young, 196 S.W.3d 85, 101 (Tenn. 2006). Accordingly, "[a]lthough venue is not an element of the crime, the [S]tate must prove by a preponderance of the evidence that the offense was committed in the county alleged in the indictment." State v. Anderson, 985 S.W.2d 9, 15 (Tenn. Crim. App. 1997) (citations omitted); see also Tenn. Code Ann. § 39-11-201(e) ("No person may be convicted of an offense unless venue is proven by a preponderance of the evidence."); Tenn. R. Crim. P. 18(a) ("Except as otherwise provided by statute or by these rules, offenses shall be prosecuted in the county where the offense was committed.").

"Venue is a question for the jury," Young, 196 S.W.3d at 101 (citing State v. Hamsley, 672 S.W.2d 437, 439 (Tenn. Crim. App. 1984)), and can be established by circumstantial evidence. Id. at 101-02 (citing State v. Bennett, 549 S.W.2d 949, 950 (Tenn.

1977)).  To determine venue, the jury is permitted to draw reasonable inferences based on the evidence presented.  Id. at 102 (citing State v. Johnson, 673 S.W.2d 877, 882 (Tenn. Crim. App. 1984)).

The victim testified that the defendant began pinching her nipples and fondling her genital area while they were traveling in his vehicle on Lebanon Road toward Lebanon and that he continued  the same behavior after turning his vehicle around, stopping only when they reached his Davidson County home.  This testimony was sufficient to establish venue in Davidson County by a preponderance of the evidence.  We conclude, therefore, that the trial court did not err in allowing the jury to deliberate on Counts 1 and 2 of the indictment.

## IV.  Consecutive Sentencing

The defendant contends that the trial court abused its discretion in ordering that his felony sentences be served consecutively, arguing, *inter alia*, that because the defendant's previous crimes occurred in the early 1990's or before, he is neither a professional criminal who had devoted his life to criminal acts as a major source of his livelihood, nor an offender whose record of criminal activity is extensive.  We respectfully disagree.

The trial court may order multiple sentences to run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) apply, including that the defendant is a professional criminal who has knowingly devoted his life to criminal acts as a major source of livelihood, or an offender whose record of criminal activity is extensive.  Id. § 40-35-115(b)(1), (2).  We review the trial court's consecutive sentencing determinations for abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision.  See State v. Pollard, 432 S.W.3d 851,860 (Tenn. 2013) (applying same deferential standard announced in State v. Bise, 380 S.W.3d 682 (Tenn. 2012) to trial court's consecutive sentencing decisions).

The trial court based its order of consecutive sentencing on its finding by a preponderance of the evidence that the defendant was both a professional criminal and an offender with an extensive record of criminal activity.  The exhibits to the sentencing hearing, which reveal that the defendant had no employment history other than while a prisoner in the federal prison sentence and was sentenced in 1992 to sentences of twenty-five years, thirty years, and life for his South Carolina convictions, support these findings. Accordingly, we affirm the sentencing determinations of the trial court.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial

court.

_____
ALAN E. GLENN, JUDGE